BURKE *v.* AMERICAN LOAN AND TRUST COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

No. 102. Argued December 4, 1894. — Decided January 7, 1895.

An agreement by a Finance Company to undertake the work of the reorganization of a railway company and the procuring of a loan to it is *held* to have been executed by it so far as to entitle it to a commission of ten per cent on the par value of the bonds issued by the company, payable in such bonds at par.

On January 23, 1887, a decree of foreclosure and sale was entered in the Circuit Court of the United States for the Northern District of Ohio, in the case of *The American Loan & Trust Company* v. *The Toledo, Columbus & Southern Railway Company and Theophilus P. Brown.* In this decree there was a finding that on April 22, 1885, the defendant railway company, owning a line of railway, with appurtenances, extending from Toledo to Findlay, had issued 825 bonds of $1000 each, and secured the same by a trust deed on all its property, and that it had defaulted in the payment of interest on the bonds; and an order for a sale of the property in satisfaction of the debt, principal, and interest. On October 16, 1888, the property was sold for the sum of $600,000 to Stevenson Burke and Charles Hickox, who turned in on their purchase 713 of the outstanding bonds, and at the same time made claim of title to the remaining 112 not in their possession. On February 4, 1889, the sale was confirmed, and the dispute as to the ownership of the bonds not surrendered was referred to a special master, who, on March 25, 1890,

reported adversely to the claims thereto of the said purchasers. This report was sustained by the court on December 20, 1890, and a final decree of distribution entered. Pending these proceedings Charles Hickox died, and an order of revivor as to his interest was entered in the name of Charles G. Hickox, his administrator. From the decree the appellants took this appeal. On the hearing in this court the only contention was as to the ownership of 80 of these bonds which had been delivered to the American Finance Company.

The dispute as to title grew out of these facts: Prior to April 14, 1884, Theophilus P. Brown was the owner of all the stock except a nominal amount, and of all the first mortgage bonds, amounting to $800,000, of the Toledo and Indianapolis Railway Company. The bonds were held in hypothecation by various persons or corporations to secure the payment of certain obligations of the railway company or of Brown. The railroad had been constructed from Toledo to Findlay, in the State of Ohio, a distance of about 41 miles, but was at the time in the hands of a receiver. There were also sundry lien claims for right of way, lumber, and material. In order to extricate himself and the railway company from the financial embarrassments, and to provide for extending the railroad, he, as party of the first part, on that day entered into a contract with the American Finance Company as party of the second part. The contract provided conditionally for the organization of a new railroad corporation. To this new corporation all the stock, bonds, property, and franchises of the old corporation were to be sold and transferred, and the former was to issue its stock and bonds — of the former $25,000 per mile, and of the latter $20,000 per mile — such stock and bonds to be used in the purchase of the properties of the old corporation, in the payment of its debts and obligations, and in extending the road. The Finance Company was to undertake the work of organization, the settlement of the claims, and the procuring of a loan of from $300,000 to $400,000 in money, to be secured by the promissory note of the party of the first part, and a pledge of either bonds of the old or the new corporation, the money thus raised to be used

in payment of the debts, and in extension of the road. Articles six, nine, and ten of the contract are as follows:

"ARTICLE VI. There is to be allotted and paid to said party of the second part, in consideration of the premises, a commission or compensation of two and one-half per centum on the amount of money raised by said party of the second part for said party of the first part by way of loans or by means of the settlement of the claims and obligations: such commission or compensation to be payable at such time as the money received from such loan or loans shall be paid over to said party of the first part by said party of the second part, or as the existing obligations secured by the pledge of bonds as collateral shall be taken up, and as said liens and other claims shall be paid by said party of the second part, it being understood that the commission mentioned in this article will have been earned by said party of the second part whenever the settlement shall be brought about as result of this agreement. But it is understood and agreed that if and so far as the loan of money shall be obtained, said party of the first part is to have the right of causing the purchase of such claims and liens upon such terms as he may be able to make with the holders thereof, and that whatever discount is saved in such purchase shall inure to the benefit of said party of the first part."

"ARTICLE IX. Said party of the second part is to receive in consideration of the premises a commission or compensation of ten per centum on the face or par value of the bonds and stock issued and to be issued by said railroad companies and negotiated: said ten per centum on said bonds being payable in said bonds at par, or in the net cash proceeds of the sales thereof, at its option, and on said stock in said stock at par: such payments or deliveries to be made from time to time *pro rata* as any of said bonds shall be negotiated, sold, or exchanged for outstanding liabilities or for property, labor, and materials required by said railroad companies or either of them, or otherwise used or disposed of.

"ARTICLE X. In addition to the said ten per centum of stock hereinbefore agreed to be paid to said party of the second

part as commission, there is to be appropriated and transferred to said party of the second part, as hereinbefore mentioned, in further consideration of the premises and of its undertakings to secure the marketing of said bonds, the forty-five per centum of the capital stock of said new railroad company, the same to be issued and delivered to said party of the second part *pro rata*, from time to time, as said bonds or any of them shall be negotiated or otherwise disposed of, as provided in paragraph last above written : but the total of said ten per centum commission on stock and bonds shall not exceed ten per centum of the amount issued for each mile of road in the name of the new railroad company."

In pursuance of this agreement the Finance Company made arrangements with Israel B. Mason, of Providence, and Francello G. Jillson, of Woonsocket, in Rhode Island, for a loan of $325,000, but before the loan was actually consummated, and on September 24, 1884, a tripartite agreement was entered into between Brown as party of the first part, the Finance Company as party of the second part, and Mason and Jillson as parties of the third part, which contained these recitals and stipulations :

"That whereas an agreement was entered into, under date of April 14, 1884, by and between said parties of the first and second part (copies of which are held by each of the parties hereto) in relation, among other things, to the negotiation undertaken by said party of the second part for said party of the first part of the notes of said party of the first part to the amount of $325,000, and also to the negotiation of $800,000 of the stock and $800,000 of the first mortgage bonds of said Toledo and Indianapolis Railway Company, and said party of the second part has requested said parties of the third part to take said notes on behalf of themselves and associates, and said parties of the 3d part have consented thereto, upon and subject to the terms and conditions herein expressed, and subject to the consummation of all the details to the satisfaction of all the parties hereto :

"It is therefore hereby agreed by and between the parties hereto that said terms and conditions are and shall be as follows :

" 1. Said Brown is to make, endorse, and deliver his several promissory notes in approved. form and denominations, payable to his own order within two years from this date, with interest at six per cent per annum from date, said interest to be payable semi-annually, and said notes to be accompanied by first mortgage bonds of said Toledo and Indianapolis Railway Company, at the rate of fifty cents on the dollar as collateral security, said bonds bearing coupons maturing April 1, 1885, all past-due coupons and those maturing October 1, 1884, being first taken off and cancelled.

\*          \*          \*          .          \*          \*

" 6. A bonus of ten per cent on the amount of bonds pledged as collateral security for the payment of said notes is to be paid to the purchasers of said notes at the time of such purchase, in the first mortgage bonds of said Toledo and Indianapolis Railway Company at par.

\*          \*          \*          \*          \*

" 8. The net proceeds of said notes are to be deposited in such bank or trust company as the said Mason and Jillson and said American Finance Company may designate; such deposit to be made for the credit and account of said ' American Finance Company, trustee,' in trust for disbursement by it for the purposes hereinabove expressed.

" 9. All the remainder of said $800,000 of first mortgage bonds of said Toledo and Indianapolis Railway Company over and above the $650,000 of the same pledged to secure the payment of said $325,000 of said notes are hereby appropriated as follows : 1. To the purchasers of said notes their said bonus, amounting to $65,000 thereof, to be distributed among them *pro rata* according to their respective holdings of said notes. 2. To said American Finance Company $80,000 thereof, in full payment of all its claims for commissions for negotiating said $800,000 of said bonds. 3. To said Brown $5000 thereof ; such appropriations and the delivery of said bonds to be made from time to time *pro rata* as said notes are disposed of."

Provision was also made in this contract for a substitution of the bonds and stock of the new corporation as soon as it

should be organized.   These contracts were carried into effect, Mason and Jillson receiving the notes of Brown to the amount of $325,000, together with the bonds of the Toledo, Columbus and Southern Railway Company, the new corporation, $650,000 as collateral and $65,000 as bonus.   The $80,000 bonds were delivered to the Finance Company.   Subsequently Brown, Mason, and Jillson sold out to Burke and Hickox, and transferred to them all the bonds then remaining in their possession, to wit, the 713 surrendered at the time of the purchase.

*Mr. Stevenson Burke* for appellants.

*Mr. Benjamin F. Blair* for appellee.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

The contention of appellants is that by the contract of April 14, 1884, the Finance Company was to receive a commission of two and one-half per cent upon all moneys obtained by way of loans; that it has been paid such sum; that the ten per cent provided by article nine was to be in compensation for the negotiation of the bonds, and to be paid over to the Finance Company from time to time *pro rata* as such bonds should be negotiated, sold, or exchanged for outstanding liabilities, or for property, labor, and material; that none were so negotiated, sold, or exchanged, and, therefore, nothing ever became due to the company on account thereof; that the tripartite agreement of September 24, 1884, reaffirms the same stipulation, for it provides that the bonds shall be "appropriated as follows . . . to said American Finance Company $80,000 thereof in full payment of all its claims for commissions for negotiating said $800,000 of said bonds."

We are unable to concur in this construction.   Article nine does not limit the ten per cent compensation to the case of bonds "negotiated, sold, or exchanged," but extends it to those "otherwise used or disposed of;" and $720,000 — that is, all of the $800,000 except the ten per cent received by the

Finance Company — were used in securing the notes for $325,000, and in payment to Brown. So that it might plausibly be urged that under the terms of the first agreement, taken by itself, the Finance Company had earned the $80,000 of bonds. But we are not limited to the language of the first agreement. The second provides that the $150,000 of bonds remaining after the pledge of the $650,000 to secure the payment of the money borrowed shall be "appropriated" as follows: To the purchasers of the notes, a bonus of $65,000; to the Finance Company, $80,000; and to Brown, $5000; and at the close of the words of appropriation, and applicable to each of them, is this language: "Such appropriations and the delivery of said bonds to be made from time to time *pro rata* as said notes shall be disposed of." The notes were all disposed of, and so, within the letter of this stipulation, the time had arrived for the appropriation and delivery of all of the bonds. The purchasers of the notes, as well as Brown, unquestionably took title to the bonds "appropriated" to them; why did not the company, the second of the three parties named, in like manner obtain title?

Not only had the time arrived for the "appropriation" of these bonds to the Finance Company, but in fact they had been delivered. Each bond carried on its face a proviso that it should not become valid or obligatory until authenticated by the signature of the trustee. As no question is made of the validity of these bonds, it must be assumed that they were thus each duly authenticated. Negotiable bonds — and these were negotiable bonds — may be transferred by the holder to a *bona fide* purchaser so as to vest in the latter a good title as against all equities between the maker and the original holder, and as a matter of fact the Finance Company did before this controversy appropriate all of these bonds as collateral security for loans made to it, and otherwise. Knowledge that these bonds could be thus used must be assumed, and as there is no pretence that the Finance Company surreptitiously or fraudulently obtained possession, it is a fair inference that they were delivered to it with the understanding on the part of all the parties of its full right to them.

There is no full disclosure of all the circumstances under which the several holders received these bonds from the Finance Company, and no testimony to impeach their good faith in the transactions by which they received them. It is, therefore, difficult to see why, even if any doubt existed as to the title of the Finance Company, they are not protected as *bona fide* holders.

Still, further, the tripartite agreement was, as we have seen, executed on September 24, 1884. Eight days before its execution, and on September 16, the president of the Finance Company wrote to Brown a letter, received by him on the next day, the 17th, in which letter it was stated: " Our company cannot afford, of course, for the little 2½ per cent commission on the loan only, to use its position and capital to set the road on its feet and take 'the risk of your death, and any contingency that might otherwise arise, and hence we, and Messrs. Jillson & Mason, are treating the negotiation as a sale of the bonds, but in doing this our company extinguishes all its claims for commissions, so far as the present portion of the road is concerned."

With such statement of the understanding of the Finance Company, Brown signed the tripartite agreement, providing for the appropriation of the $80,000 of bonds to the Finance Company in full payment of all its claims for commissions. It is hard to believe in the light of this letter, that the parties had any other idea than that, at least as soon as the notes were disposed of, the $80,000 should become the property of the Finance Company. *Brown* v. *American Loan &c. Co.,* 31 Fed. Rep. 516.

Finally, it is found by the master that " the Finance Company did in fact render important services to T. P. Brown under these agreements in the negotiating of said bonds and negotiating of loans, which enabled T. P. Brown to pay off the claims against the old Toledo and Indianapolis Railroad Company, and thereby secure possession and control of the bonds of said Toledo and Indianapolis Railroad Company which had been hypothecated to various parties to secure the claims for which said company was indebted."

We think that the Circuit Court, in view of all these considerations, did not err in its conclusion, and, therefore, its decree is

*Affirmed.*

MR. JUSTICE BROWN took no part in the decision of this case.